J-S36008-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| STEVEN DWAINE STINE | : | |
| | : | |
| Appellant | : | No. 322 MDA 2024 |

Appeal from the Judgment of Sentence Entered February 8, 2024
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0001934-2021

BEFORE:  LAZARUS, P.J., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY LAZARUS, P.J.:                    **FILED: OCTOBER 21, 2024**

Steven Dwaine Stine appeals from the judgment of sentence, imposed in the Court of Common Pleas of York County, after a jury convicted him of one count each of driving under the influence ("DUI") of alcohol or controlled substance—third or subsequent offense,[1] DUI controlled substance (marijuana)—third or subsequent offense,[2] DUI controlled substance (metabolite of marijuana)—third or subsequent offense,[3] and possession of drug paraphernalia.[4]  On appeal, Stine challenges the sufficiency of the evidence supporting his convictions.  After our review, we affirm.

---

[1] 75 Pa.C.S.A. § 3802(d)(3).

[2] *Id.* at § 3802(d)(1)(i).

[3] *Id.* at § 3802(d)(1)(iii).

[4] 35 P.S. § 780-113(a)(32).  Stine also pled guilty to one count of possession of a small amount of marijuana.  *See id.* at § 780-113(a)(31)(i).

The trial court set forth the facts of this case as follows:

Cheyenne Kohler testified that on April 2, 2021, she was driving in Lower Windsor [Township] with a friend on their way to Dollar General later in the evening. [Kohler] testified that while she was driving, a green car was speeding up behind her. She testified that the car then swerved around her and nearly ran her off [of] the road. [Kohler] additionally testified that the same car swerved around a yellow Hummer that was behind her[.]

[Kohler] testified that after the car had swerved around her, the vehicle ran a four[-]way stop [sign] past the Dollar General and then turned around. When asked how fast the green car was traveling, [Kohler] testified that he was going well over the posted speed limit of 45 mph.

[Kohler] testified that after the green car ran the four-way stop, [] the vehicle entered a driveway and turned around. She then testified that after the vehicle turned around, [it] was driving straight at her in her lane of travel. At this point, [Kohler]'s friend began recording the green vehicle and [Kohler] testified that she turned her car around and followed the green car. [Kohler] testified that[,] during this time, she contacted 911 twice because she was concerned about the green car's driving. She further testified that[,] after she began following the vehicle, [] the vehicle ran another light at the square [in] Red Lion.

While following the green vehicle, [Kohler] testified that she lost the vehicle and that her friend stopped recording at that point. [Kohler] testified that after she lost the vehicle, she conducted a U-Turn to head back towards Red Lion. [Kohler] testified that once she was back in Red Lion, she saw the green car again at a Rutter's. She testified that she knew it was the same car because it had damage on the front passenger's side of the vehicle. While at Rutter's, [Kohler] testified that she was able to take a picture of the green vehicle's license plate and called the police again. [Also w]hile at the Rutter's, [Kohler] testified that she observed the driver of the green vehicle return to his car. [Kohler] was able to identify the driver of the vehicle as [Stine] in the courtroom.

When [Stine] left the Rutter's, [Kohler] testified that she began following him again and followed him less than a mile to a house. When [Stine] arrived at the house, [Kohler] testified that he parallel parked his car "as good as he could." [Kohler] testified

that[,] while parking, [Stine] hit the curb and hit the car behind him. [Kohler] testified that when [Stine] exited the car to enter the house, he appeared "tipsy." [Kohler] then testified that roughly 10 minutes after [Stine] entered the house, the police arrived on scene.

Trooper Mikhail Watson arrived on scene at approximately 8:51 p.m.[, and that] two other officers were already on scene when he arrived. Trooper Watson testified that he was able to make contact with [Stine] and immediately noted that [Stine]'s eyes were blood-shot and that he gave off a very strong odor of alcohol. Trooper Watson testified that it seemed that [Stine] was having a panic attack, as he couldn't form complete sentences and was going off on tangents regarding subject matters that were[ not] relevant. Trooper Watson testified that he had asked [Stine] if he had any drugs or alcohol since he had arrived home. [Stine] indicated that he had not. Trooper Watson testified that [Stine] appeared disheveled and inappropriately dressed for the weather, as he was shivering in the cold.

Trooper Watson testified that[,] in speaking to [Stine], [Stine] indicated that he[ is] a daily smoker of marijuana and does not have a medical marijuana card. Trooper Watson further testified that [Stine] indicated that he had been at a friend's house in Lower Windsor. Trooper Watson testified that [Stine] indicated that he was unsure if he consumed drugs[ or ]alcohol before he left his house to go to his friend's house or if he consumed [either] at his friend's house. Thereafter, Trooper Watson testified that he asked [Stine] if he wanted to retrieve a jacket because he wished to have [Stine] perform standardized field sobriety tests [("FSTs")]. Trooper Watson testified that when he went inside with [Stine] to obtain a jacket, [] he observed in plain view drugs and drug paraphernalia (specifically marijuana)[,] as well as open alcohol containers. Trooper Watson testified that the home did not smell of freshly smoked marijuana. Trooper Watson testified that he seized the drugs and paraphernalia in plain view. While testifying, Trooper Watson identified the evidence he had seized from [Stine]'s home as a rolling tray, a butane torch, bongs, and scrapers. Trooper Watson testified that these items are all items typically used in processing/preparing marijuana for smoking.

After seizing the evidence from [Stine]'s apartment, Trooper Watson took [Stine] outside to complete [FSTs]. [Stine] was asked to perform the horizontal gaze nystagmus test, the walk[-]and[-]turn test, and the one-legged stand test. A modified

Romberg test[5] was also presented to [Stine]. Trooper Watson then testified that [Stine] performed the tests and gave several clues of impairment during the tests. Trooper Watson testified that during the one-legged stand[, Stine] put his foot down, had a heavy sway, and used his arms for balance. During the walk[-]and[-]turn test[, Stine] used his arms for balance, took eight steps, stepped off the line, and stopped after he turned around. Trooper Watson testified that, based on [Stine]'s performance on the [FSTs], he took [Stine] into custody for suspicion of DUI.

Prior to taking [Stine] into custody, Trooper Watson testified that he spoke with the witness, [Kohler]. Trooper Watson testified that [Kohler] provided him with the video her friend recorded and her version of events. Trooper Watson testified that, based on [Kohler]'s recounting the incident, he checked the vehicle behind [Stine]'s parked vehicle. Trooper Watson testified that there was an obvious paint transfer from [Stine]'s vehicle to the vehicle behind him, indicating that [Stine]'s vehicle had hit the other vehicle. Trooper Watson testified that he then took [Stine] for a blood draw. Trooper Watson testified that he read [Stine] the DL-26 form, and [Stine] consented to a blood test.

A stipulation was then read into the record regarding [Stine]'s blood draw. The stipulation was as follows: "If called [], Erin A. Spargo, PhD, forensic toxicologist from NMS Labs[, would have testified that she] received two gray top tubes of [Stine]'s blood as collected on April 2, 2021, at 10:16 p.m.[,] from the Pennsylvania State Police. Utilizing the standard practices and protocols of NMS Labs, Dr. Spargo tested [Stine]'s blood for the presence of both alcohol and controlled substances. As a result of this testing, the following substances were found in [Stine]'s blood[:] Ethanol, which is alcohol[,] 77 milligrams per deciliter[], which is [a blood-alcohol content ("BAC")] of 0.077[;] 11-Hydroxy Delta-9THC, which is [the] active metabolite in marijuana, 4.2 nanograms per milliliter[;] Delta- 9Carboxy THC, which is the

_____

[5] A Romberg Test, which evaluates neurological function, is sometimes used by law enforcement to determine if a driver is under the influence. ***See*** http://www.fieldsobrietytests.org/rombergbalancetest.html#:~:text=To%20 administer%20this%20test%2C%20the,think%20it%27s%20been%20that %20long, last visited 9/20/24. To administer this test, the officer will ask the individual to stand with his feet together, head tilted slightly back, and eyes closed. ***Id.*** The individual is then asked to estimate when 30 seconds has passed and say "stop" when he thinks it has been that long. ***Id.***

inactive metabolite of marijuana, 260 nanograms per milliliter[;] Delta-9 THC, which is the active ingredient in marijuana, 16 nanograms per millimeter. Following review, Dr. Spargo memorialized the findings into a written report, which is a toxicology report that was provided to the Pennsylvania State Police."

Trial Court Opinion, 4/25/24, at 2-7 (citations to record omitted).

On December 19, 2023, a jury found Stine guilty of the above-mentioned offenses. On February 8, 2024, the trial court sentenced Stine to a period of one year's incarceration, followed by seven years of probation, for DUI alcohol or controlled substance—third or subsequent offense. *See* Sentencing Order, 2/8/24. The remaining convictions merged for purposes of sentencing. *Id.* Stine filed a timely notice of appeal, followed by a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

Stine challenges the sufficiency of the evidence supporting his DUI convictions.

> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. [] When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

*Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted).

Stine was convicted under subsections 3802(d)(1)(i), (d)(1)(ii), and (d)(3) of the Motor Vehicle Code, which provide as follows:

- 5 -

**(d) Controlled substances.**--An individual may not drive, operate[,] or be in actual physical control of the movement of a vehicle under any of the following circumstances:

(1) There is in the individual's blood any amount of a:

(i) Schedule I controlled substance, as defined in the act of April 14, 1972 (P.L. 233, No. 64),1 known as The Controlled Substance, Drug, Device and Cosmetic Act;

. . .

(iii) metabolite of a substance under subparagraph (i) or (ii).

. . .

(3) The individual is under the combined influence of alcohol and a drug or combination of drugs to a degree which impairs the individual's ability to safely drive, operate[,] or be in actual physical control of the movement of the vehicle.

75 Pa.C.S.A. §§ 3802(d)(1)(i)-(ii), and (d)(3).  Marijuana is defined as a Schedule I controlled substance.  ***Commonwealth v. Sparrow***, 317 A.3d 583 (Pa. Super. 2024), citing 35 P.S. § 780-104(1)(iv).

Stine argues that the Commonwealth did not prove, beyond a reasonable doubt, the time period during which he was operating a motor vehicle.  ***See*** Brief of Appellant, at 11.  Stine asserts that neither Kohler nor Trooper Watson testified to the time of the relevant events, there was no evidence presented as to when officers were dispatched to the scene, and the 911 logs were not presented at trial.  ***Id.***  Stine alleges that "Kohler said she saw [him] driving sometime in the evening.  Trooper Watson made contact with [Stine] at 8:55 p.m. [and a] blood draw was at 10:16 p.m." ***Id.*** at 13.

Thus, it is "speculation, assumption[,] and conjecture as to when [Stine] was driving prior to 8:55 p.m." *Id.* at 12. He is entitled to no relief.

Here, there was more than sufficient evidence to prove, beyond a reasonable doubt, that, at the time he was in control of his motor vehicle, Stine was under the influence and impaired and, thus, guilty of the three DUI offenses of which he was convicted. Kohler testified to observing Stine driving recklessly "later in the evening" on April 2, 2021. N.T. Trial, 12/19/23, at 136. Video recorded by Kohler's passenger and presented at trial shows Stine driving in the wrong lane of traffic and swerving to avoid Kohler's oncoming car. *See* Commonwealth's Exhibit 1, at 00:00-00:01. Although Kohler lost sight of Stine's vehicle for approximately ten minutes, she observed the vehicle again at Rutter's in Red Lion,[6] *id.* at 142, 158, and proceeded to follow Stine as he drove "[l]ess than a mile" to his residence. *Id.* at 146. There, Kohler observed Stine hit the car behind him in an attempt to parallel park and noted that Stine appeared "tipsy" as he exited his vehicle. *Id.* at 147. Kohler testified that police arrived "a couple minutes . . . ten minutes maybe" later. *Id.* at 148.

Trooper Watson testified that he received a dispatch at 8:37 p.m. and arrived at Stine's residence at approximately 8:51 p.m. *Id.* at 174-75. Trooper Watson observed that Stine's eyes were bloodshot, he gave off "a very strong odor of alcohol," and he "couldn't perform complete sentences."

_____

[6] Kohler knew it was the same car "[b]ecause it had damage to the front passenger's side[.]" *Id.* at 143.

*Id.* at 178.  In response to questioning by Trooper Watson, Stine stated that he had not consumed any drugs or alcohol since arriving home.[7]  *Id.*  Stine's performance on three field sobriety tests further contributed to Trooper Watson's belief that Stine was impaired.  *Id.* at 195-96.  A blood draw performed on Stine at York Hospital at 10:16 p.m., less than two hours after Trooper Watson received the original dispatch, revealed a BAC of 0.077, the presence of the active ingredient in marijuana, and marijuana metabolites.  *Id.* at 198.

Based on the foregoing, the evidence was sufficient to demonstrate that Stine's blood contained marijuana and its metabolites while he operated his vehicle and that his ability to safely drive, operate, or be in actual physical control of the movement of the vehicle was impaired by the combined influence of alcohol and marijuana.  *See* 75 Pa.C.S.A. §§ 3802(d)(1)(i), (d)(1)(ii), and (d)(3).  Accordingly, we affirm.

---

[7] Trooper Watson testified that, upon entering Stine's home, there were empty beer bottles but no odor of freshly smoked marijuana.  *Id.* at 182.

Judgment of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/21/2024